IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ROBERT A. EATON,<br><br>                    Plaintiff,<br><br>vs.<br><br>MONTANA SILVERSMITHS,<br><br>                    Defendant. | CV 18-65-BLG-SPW-TJC<br><br><br>**U.S. MAGISTRATE JUDGE<br>AND ORDER** |

Before the Court is Defendant Montana Silversmiths' Motion for Summary Judgment on Plaintiff Robert A. Eaton's remaining claims (Counts 1-6)[1] in the Fourth Amended Complaint. (Doc. 94.) Also pending is Eaton's "Motion to Extend Motion to Compel Deadline," and Request for Hearing on Motions for Summary Judgment. (Docs. 97, 109.) The motions are fully briefed and ripe for review. Having considered the parties' submissions, the Court orders that Montana Silversmiths' motion (Doc. 94.) be GRANTED in part and DENIED in part. Eaton's motions for extension and for hearing will be DENIED.

//

//

---

[1] The Court previously dismissed Count 7. (*See* Docs. 54, 79, 110.)

1

## I.     Background[2]

Eaton obtained a Bachelor of Fine Arts in metalsmithing from Montana

State University in 2000.  (Doc. 105 at ¶ 1.)  Montana Silversmiths in Columbus,

Montana, hired Eaton on May 13, 2013, into the apprentice program as a

designer/engraver, when he was 39 years old.  (Doc. 105 at ¶¶ 2-3.)  Eaton worked

for Montana Silversmiths in their engraving department until his termination on

June 15, 2017.  (Doc. 105 at ¶ 52.)

In July 2015, Eaton met with Colette Schlehuber of Montana Silversmiths'

Human Resources Department to discuss issues he perceived in the engraving

department, including the use of racial slurs and the sexual harassment of a fellow

female employee.  (Docs. 41 at ¶ 6; 96-19 at 6-7: 19:17 - 21:14.)  In keeping with

Eaton's request to keep the complaint confidential, Schlehuber approached the

female employee to ask if the work environment made her feel uncomfortable, but

she admittedly did not conduct an "official" internal investigation.  (Doc. 96-19 at

6-7: 19:17 - 21:14.)  The female employee told Schlehuber that she enjoyed being

in the engraving department and nothing in the work environment made her

uncomfortable.  (*Id.*)  The employee later confirmed in her deposition testimony

that she was not uncomfortable with her work environment. (Doc. 96-24 at 4: 9:12-

---

[2] The background facts set forth here are relevant to the Court's determination of
the pending motion for summary judgment, are taken from the parties'
submissions, and are undisputed unless otherwise indicated.

15.) Other than Eaton's own reports of sexual harassment, no other similar reports were made to management. (Doc. 96-19 at 29: 112:18 - 113:3.) It appears that no further investigation or follow-up was conducted with respect to Eaton's 2015 report.

Eaton, like other Montana Silversmiths' employees, was subject to annual performance evaluations. Montana Silversmiths conducted Eaton's 2017 performance review on April 4, 2017. (Doc. 105 at ¶ 13; *see* Doc. 96-3 at 7-8.) Eaton's direct supervisor, Justin Deacon, noted two areas of deficient performance in which Eaton "Does Not Consistently Meet Expectations" – interaction with co-workers and resolves conflicts in an appropriate manner. (Docs. 96-3 at 7-8; 105-10 at 35.) As to the first area, Deacon commented: "[a]t times creates unwelcoming environment in regards to [Deacon's son] Travis while at the same time interacting well with Rick and Brian." (*Id.* at 7; 105-10 at 35.) In the second area, Deacon reported that Eaton "[s]idesteps proper reporting of concerns outside of management hierarchy." (*Id.*) Eaton was also found to significantly exceed expectations in the area of being a "[s]elf starter, shows resourcefulness," for which Deacon commented that he was a "very hard worker, always on task." (*Id.*) In sum, Eaton's total appraisal grade was 2.70, placing him between the ratings for "Exceeds Expectations" (2.0) and "Meets Expectations" (3.0). (*Id.* at 8; 105-10 at 36.)

3

Eaton disputes that the negative ratings were warranted.  He points out that Deacon did not want to include the comments relative to Travis.  It was included at the insistence of Lance Neirby, Montana Silversmiths' Vice President of Operations.  (*See* Doc. 105-4 at 43: 28:17-21; at 44: 29:7-17; at 53: 65:19 - 66:22.)

Additionally, the criticism of Eaton "sidestepping" proper reporting channels appears to be contrary to Montana Silversmiths' employee handbook.  The 2015 Employee Handbook directs individuals with a complaint to "discuss their concerns with their immediate supervisor, Human Resources or any member of management."  (Doc. 105-8 at 8.)  The handbook also "has a policy that encourages any employee to speak to their supervisor, manager or human resource personnel at any time for any reason."  (*Id.* at 21.)

Eaton met with Neirby later in the day on April 4 to discuss the evaluation and other issues in the workplace.  (Docs. 41 at ¶ 8; 96-4 at 2; 105-10 at 39.) During the meeting, Eaton raised several issues, included nepotism, sexual harassment, and various observations of co-workers' personal and inter-personal behaviors and relationships.  (Docs. 96-4 at 2-3; 105-10 at 39-40.)

The next day, April 5, Neirby, Deacon, and Eaton met to discuss the performance review and the issues Eaton raised the previous day.  (Doc. 105 at ¶ 15.)  Either before or during the meeting Neirby changed the language of the evaluation in the category of "[i]nteraction with co-workers" from focusing on

4

"Travis" to state that a "[c]hallenging relationship exists between employee and direct supervisor." (Doc. 96-3 at 9.) Thus, the criticism shifted from a co-employee to Eaton's relationship with his supervisor, Justin Deacon. The rating for that category remained at the lowest possible rating. The revised performance evaluation also deleted a comment in the original evaluation, which read "Robert will not acknowledge Travis's existence." (Doc. 96-3 at 8, 10.)

By all accounts, the April 5 meeting was contentious. Neirby documented the meeting in an email to Schlehuber in human resources, in which he described Eaton as being "very agitated." (Docs. 96-4 at 2; 105-10 at 41-42.) Neirby explained that he tried to focus Eaton on better communication with Deacon but Eaton "was so stressed out and agitated." (Id.; see Doc. 96-5.)

Eaton, on the other hand, avers that he felt Neirby mocked him during the meeting and pushed him to defend himself for his complaints of nepotism and sexual harassment, asking: "what are [you] going to do then, what are you going to do then?" (Doc. 103-2 at ¶ 64.) Eaton attests that he responded, "You guys act like I am going to bring a bomb, that IS NOT what I'm saying, I am saying I am going to have to get a lawyer." (Id.) (emphasis in original).

At the conclusion of the meeting, Neirby and the management team decided to send Eaton "home for the remainder of the week with pay to allow for a cooling-off period." (Doc. 96-20 at 22: 84:19-21.) Neirby then reported the incident to the

Stillwater County, Montana Sheriff's Office at 11:24 a.m., the report of which states:

> Per 32-2 Lance notified of a problem that arised [sic] with an employee this morning and was sent home for the rest of the week. Does not fore see [sic] any further problems but wanted us to be aware of the employee and the situation[.]

(Docs. 105 at ¶ 24; 105-12 at 3.)

Eaton met with Schlehuber from human resources following the meeting. Eaton relayed that he felt as though he was being retaliated against for his complaints, and stated he was going to go home and call his lawyer and the EEOC. (Doc. 96-5.) Schlehuber advised Eaton he was not being retaliated against, and instead fashioned his temporary dismissal as "a time for adjustment and time for him to think about how we all need to work together going forward." (*Id.*)

Eaton went home on April 5 as directed and composed a "grievance complaint." (Docs. 96-6; 105-7 at 5-8.) He hand-delivered the grievance on April 10, the day he returned to work after the "cooling off period." (Doc. 105 at ¶ 27.) The grievance detailed Eaton's view of the April 5th meeting, including the changes to his performance evaluation, nepotism and preferential treatment between Justin and Travis Deacon (among others), and his belief that the criticism for sidestepping proper reporting channels was contrary to the process laid out in the employee handbook. (Doc. 96-6 at 1-2.)

6

After Eaton submitted his grievance, Neirby sent an email to Schlehuber on April 13 "to further document points of concern during the discussion between Robert, [Deacon] and myself outlined in my Wednesday April 5th email." (Docs. 96-4 at 1; 105-10 at 41.) Neirby characterized Eaton as "extremely angry," "hyper focused, red faced and his body posture was aggressive with clinched hands and was sitting forward in his chair in a dominating stance," and that he "yelled multiple times and told [Deacon] that he F----D him from the beginning and never helped him at all." (*Id.*) Neirby also recounted Eaton as saying, "'Everyone thinks I am going to go postal or bring in a bomb' followed by I have a lot of thinking to do and something like 'I won't bring in a bomb and I have talked to a lawyer.'" [*Sic*] (*Id.*) Neirby reported that he and Deacon were "shocked at the paranoid manner in which Robert was yelling and talking." (*Id.*) Among other things, Neirby expressed that his "concern now is how to evaluate Robert's comments about [going postal or bringing in a bomb] .... These comments are the reason I contacted the Undersheriff." (*Id.*)

The same day, April 13, Montana Silversmiths hired Associated Employers of Montana ("AEM") to investigate the allegations contained in Eaton's grievance letter. (Docs. 41 at ¶ 13; 105 at ¶ 28.) Montana Silversmiths state that neither its' nor AEM's investigation corroborated any of Eaton's complaints of sexual or

7

racial harassment. (Doc. 96 at ¶¶ 11, 30.) Eaton disputes the integrity of both investigations.

Shortly after returning to work, Eaton took scheduled medical leave on April 14 for carpal tunnel release surgery. (Docs. 41 at ¶ 14; 105 at ¶ 42.) Schlehuber and Eaton subsequently exchanged communications regarding his return to work post-surgery.

On June 1, Schlehuber memorialized a phone call with Eaton, in which it was noted that Eaton's physician had updated his medical status, extending his leave until June 12. (Doc. 105-12 at 8, 9.) Schlehuber advised Eaton that he would need a medical release form for his return. (*Id.*) Montana Silversmiths states that Eaton was never released by his treating physician to return to work so that it could discuss any necessary workplace accommodations with him. (Doc. 96 at ¶ 43.) Eaton attempts to dispute this statement, asserting that Schlehuber would not allow him back to work despite his physician's willingness to provide a release. (Doc. 105 at ¶ 43.)[3] Nevertheless, Eaton acknowledges that he never obtained a medical release from his medical providers, didn't know why he did not

---

[3] In support, Eaton cites to several exhibits on the record, none of which support his contention that Schlehuber would not allow him to work. (*See* Docs. 105-6 at 24, 50; 105-12 at 4, 8, 9, 10.) These documents undisputedly show Schlehuber reminding Eaton that he would need a doctor's release to return to work. Eaton's citation to PLTF-1613 in Doc. 105 at 60 is erroneous; no such document is indexed in Eaton's "Exhibit List" at Doc. 105-1.

obtain a release, and never asked his provider for a release. (Docs. 96-18 at 16: 57:15 - 59:15; 105 at ¶ 47.) It also appears that Eaton did not provide Montana Silversmiths with any work restrictions or a request for accommodations.

On June 9, Montana Silversmiths issued a letter to Eaton regarding his return to work and AEM's report of his grievances. (Doc. 96 at ¶ 29.) The letter also addressed a change in Eaton's schedule. Apparently, Eaton had been given permission earlier in his tenure at Montana Silversmiths to work a modified work schedule. (Doc. 96-2.) But Neirby later instituted a policy that required everyone in the facility to work a uniform schedule within their department. (Doc. 96 at ¶ 29.) Eaton was reminded that upon his return from surgery, he would work a schedule aligned with others in his department. (*Id.*)

Prior to his return, however, Eaton's employment with Montana Silversmiths was terminated on June 15, 2017, as part of a restructuring and cost-savings plan implemented in 2016. (Doc. 105 at ¶¶ 50, 52.) Eaton's termination was part of the third phase of the reduction-in-force slated for June 2017. (*Id.* at ¶¶ 51-52.) Underpinning the restructuring and cost-savings plan was the anticipated loss of a sponsorship agreement with the American Quarter Horse Association ("AQHA"). (*Id.* at ¶ 59.) The AQHA contract was worth about $750,000 per year, comprising approximately half of the engraving department's workload. (*Id.* at ¶¶

9

61, 63.) The phase three goal was a $250,000 reduction in force savings and ultimately resulted in $294,939.47 in savings. (Doc. 96-9 at 2, 4.)

Among the criteria for terminations in manufacturing were skills and cross training, performance evaluations, disciplinary actions, and value to future business. (Doc. 105 at ¶ 51.) Montana Silversmiths state that Eaton "comparatively lacked internal cross training for different tasks and positions ... compared to other members of the Design/Engraving department," and that Eaton "only cross trained in the 'Design Fab' areas of 'Sawing' and 'Stone Setting,' as well as 'Custom Buckle Engraving'." (Doc. 96 at ¶ 53.) In support, Montana Silversmiths proffers the cross-training matrix, which shows Eaton with the lowest score of the staff. (Doc. 96-9 at 13.) Eaton disputes this assertion with the deposition of Justin Deacon, who acknowledged that Eaton also "did some ... stippling" and "soldering," and Eaton also proffers his degree in metalsmithing to support his qualifications. (Doc. 105 at ¶ 53; *see* Doc. 96-21 at 6: 19:15-18, 20:4-8.) Eaton further contends the matrix is not accurate, but he fails to cite to any evidence in the record to support the contention. (See *Id.* at ¶ 54.)

Eaton subsequently filed a complaint with the Montana Human Rights Bureau (MHRB) on July 12, alleging retaliation. (*Id.* at ¶ 67; *see* Doc. 96-12.) Eaton amended his complaint on November 12, adding claims of age and disability discrimination. (*Id.*; *see* Doc. 96-13.) MHRB issued its report on January 8, 2018,

10

finding that "the allegations of Eaton's complaint are not supported by a

preponderance of the evidence," "no reasonable cause to believe Silversmith

discriminated against Eaton in the area of employment because of his age or

disability," and no reasonable cause to believe Silversmith retaliated against Eaton

in the area of employment because he engaged in protected activity. (*Id.* at ¶ 70;

*see* Doc. 96-16.)  On March 20, 2018, the U.S. Equal Employment Opportunity

Commission adopted the Montana Human Rights Bureau's findings. (*Id.* at ¶ 71;

*see* Doc. 96-17.)

Eaton then filed the instant suit on April 4, 2018. (Doc. 2.)

## II.     Legal Standard

### A.    Summary Judgment

Summary judgment is appropriate where the moving party demonstrates the

absence of a genuine issue of material fact and entitlement to judgment as a matter

of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  Material facts are those which may affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a

material fact is genuine if there is sufficient evidence for a reasonable factfinder to

return a verdict for the nonmoving party.  *Id.*  "Disputes over irrelevant or

unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec.*

*Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

11

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party fails to discharge this initial burden, summary judgment must be denied; the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of

12

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.   Discussion

In the operative Fourth Amended Complaint, Eaton alleges retaliation (Count 1), wrongful termination (Count 2), disability discrimination (Count 3), age discrimination (Count 4), hostile work environment (Count 5), and defamation of character (Count 6).  (Doc. 48.)  Montana Silversmiths moves for summary judgment on all counts.  (Doc. 94.)  The Court will address each in turn.

### A.   Retaliation

In Count 1 of the Fourth Amended Complaint, Eaton brings a claim for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). (Doc. 48 at 2-3.)  Section 2000e-3(a) makes it unlawful to discriminate against any individual who has "opposed any practice made an unlawful employment practice by this subchapter" (opposition clause) or "made a charge ... or participated ... in an investigation, proceeding, or hearing under this subchapter" (participation clause).  *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009).  The section is also known as Title VII's "antiretaliation" provision.  See, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173-174 (2011);

13

*Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) ("Retaliation is a separate offense under Title VII.").

To survive a motion for summary judgment, a plaintiff must establish a prima facie case of retaliation. To do so, Eaton must demonstrate that: (1) he was engaging in protected activity, (2) he suffered an adverse employment decision, and (3) there was a causal link between his activity and the employment decision. *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 755 (9th Cir. 1997). In order to sustain this burden a plaintiff "need produce very little evidence." *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir. 2008).

If Eaton successfully proves a prima facie case, the burden shifts to Montana Silversmiths "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (internal citation omitted); *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983). The employer's burden is not onerous. The employer "need not persuade the court that it was actually motivated by the proffered reasons…. It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, at 254-55 (1981).

If Montana Silversmiths meets its burden, then Eaton has an opportunity to prove by a preponderance that the legitimate reason was not the true reason, but a

pretext for discrimination. *Id.* at 256; *Crown Zellerbach*, 720 F.2d at 1012.

Pretext can be shown by either direct or circumstantial evidence. "Only a small

amount of direct evidence is necessary in order to create a genuine issue of

material fact as to pretext." *Bergene v. Salt River Project Agr. Imp. & Power Dist.*,

272 F.3d 1136, 1142 (9th Cir. 2001). But "[c]ircumstantial evidence of pretext

must be specific and substantial in order to survive summary judgment." *Id.*

In his complaint, Eaton alleges that Montana Silversmiths retaliated against

him for "bringing forth concerns in the company," by changing his work schedule,

providing low marks on his annual evaluation, and laying him off after being on

worker's compensation. (Doc. 48 at 7.)

Montana Silversmiths argues (1) that Eaton cannot establish that he engaged

in protected activity because he has no evidence to support his allegations of sexual

and racial harassment, and independent investigations failed to corroborate any of

his claims, (2) that filing a worker's compensation claim does not constitute a

protected activity, and (3) it had a legitimate, nondiscriminatory reason for

terminating Eaton. (Doc. 95 at 11-12.)

## 1. Protected Activity

First, with respect to Montana Silversmith's assertion that there is no

evidence of sexual harassment or racial discrimination, Montana Silversmiths

misconstrue the focus of the "protected activity" inquiry. This requirement does

not turn on Eaton's ability to prove that sexual harassment or racial discrimination in fact occurred. Opposition to an unlawful employment practice—here, sexual harassment or use of racial slurs in the workplace—need only be based on a reasonable belief that the practice is unlawful. The plaintiff need not prove that the conduct he opposed was in fact unlawful under Title VII. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994). Rather, "opposition clause protection will be accorded 'whenever the opposition is based on a 'reasonable belief' that the employer has engaged in an unlawful employment practice." *Id.* (citing *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008,1012 (9th Cir. 1983). Even an erroneous belief that an employer engaged in an unlawful employment practice may be actionable under Title VII, if it is premised on a reasonable mistake made in good faith. *Id.*; see also, *Sias v. City Demonstration Agency*, 588 F.2d 692, 685 (9th Cir. 1978) ("When an employee reasonably believes that discrimination exists, opposition thereto is opposition to an employment practice made unlawful by Title VII even if the employee turns out to be mistaken as to the facts"). There is no evidence that Eaton did not have a reasonable belief that sexual harassment and racial discrimination had occurred.

### 2. Eaton's Termination

Montana Silversmiths next argues that Eaton's worker's compensation claim cannot provide the basis for a retaliation claim. The Court agrees. Title VII

16

protects an employee "because he has opposed any practice made an unlawful employment practice by this subchapter ...." The "filing of and collecting on a worker's compensation claim does not concern any employment practice that violates Title VII." *Harris v. Treasure Canyon Calcium Co.,* 132 F.Supp.3d 1228, 1246 (D. Idaho 2015).

But even if Eaton could establish a prima facie retaliation claim relative to his termination, Montana Silvermiths has presented a legitimate, nondiscriminatory reason for his termination. Montana Silversmiths initiated a restructuring and cost-savings plan in 2016 in preparation for an anticipated loss of a $750,000 contract with AQHA, which substantially impacted the engraving department where Eaton worked. (Doc. 105 at ¶¶ 61, 63.) During the restructuring plan, Montana Silversmiths terminated Eaton's employment along with 29 other terminations, eliminated positions, and planned retirements as part of its overall reduction in force. (Doc. 96-9.) Eaton's score on the cross-training matrix was undisputedly the lowest in the company. (*Id.* at 13.) As the U.S. Supreme Court stated in *Burdine*, the employer's burden only requires an explanation of "what [they] have done" or the production of "evidence of legitimate nondiscriminatory reasons." *Burdine*, 450 U.S. at 256. The Court finds Montana Silversmiths has satisfied that burden.

17

Eaton subsequently fails to show by a preponderance of the evidence that the reduction in force is not the true reason for his termination. Eaton contends the matrix is not accurate but fails to proffer any evidence in support. Eaton offers Deacon's testimony to show he "did some ... stippling" and "soldering," (stippling being one of the matrix categories) and also proffers his degree in metalsmithing to show his expertise. (Doc. 105 at ¶ 53; *see* Doc. 96-21 at 6: 19:15-18, 20:4-8.) But Eaton fails to show specific evidence of the nature and extent of his experience or "cross-training" in these and other areas, or to equate his degree with quantifiable skills in the matrix's select categories, sufficient to raise a genuine issue of material fact as to the true reason for his termination.

Therefore, the Court finds Montana Silversmiths has presented a legitimate nondiscriminatory reason for Eaton's termination, and Eaton has failed to show it is not the true reason for his discharge.

Eaton's remaining retaliation claims are based on his negative performance review and a change of his "agreed upon" schedule. The Court finds that Eaton has presented a prima facie case of retaliation with respect to his performance review, but not his schedule change.

### 3. Performance Evaluation

First, Eaton engaged in protected activity when he reported alleged instances of sexual harassment and what he viewed as racial discrimination to the Montana

Silversmiths' Human Resources Department in July 2015, and to the Vice President of Operations during his evaluation process in April 2017. *Crawford*, 555 U.S. at 276 ("When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity") (internal citations, quotations omitted); *Archuleta v. Corr. Corp. of Am.*, 829 F. App'x 242, 243 (9th Cir. 2020) ("Filing an internal complaint pursuant to an established reporting procedure, raising concerns in a discussion with a human-resources representative, or filing an EEOC complaint are all protected activities").

Also, during a meeting on April 4 between Eaton and Neirby, Eaton expressed that he contacted the "EEO," to which Neirby responded he had a right to obtain counsel. (Doc. 96-4 at 3-4.) He also advised Schlehuber that he intended to contact his lawyer and the EEOC during their meeting on April 5, 2017. (Doc. 96-5.) While the record does not necessarily support the existence of a separate U.S. Equal Employment Opportunity Commission filing at that time, "[t]he statutory protections against retaliation also extend to an applicant or an employee who informs his employer of his intention to participate in a statutory proceeding, even if he has not yet done so." *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1007 (9th Cir. 2002), *on reh'g en banc*, 345 F.3d 742 (9th Cir. 2003).

19

Second, Eaton has established a prima facie case showing that he was subject to an adverse employment action with respect to his performance evaluation. The U.S. Supreme Court clarified the standard to be applied in determining whether an action can constitute an adverse employment action for purposes of retaliation under Title VII in *Burlington Northern Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The Court interpreted the antiretaliation provision more broadly than the "substantive provisions" of Title VII. Unlike the requirements for a substantive discrimination claim, retaliation claims are not limited to discriminatory actions that affect the terms and conditions of employment. *Id.* at 64. Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotations and citations omitted).

Courts in the Ninth Circuit have considered whether a negative performance evaluation can be considered an adverse employment action in several cases. Some cases have recognized that a negative evaluation may support a retaliation claim. See e.g., *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("undeserved performance ratings, if proven, would constitute an 'adverse employment decision' cognizable under this section"); *Brooks v. City of San*

*Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are ... undeserved negative performance review"); *Leland v. City and Cty. of San Francisco*, 576 F.Supp.2d 1079, 1098 (N.D. Cal. 2008) (whether performance evaluation was negative or positive was a disputed issue of material fact for the jury); *Rivera v. England*, 360 F.Supp.2d 1104, 1120 (D. Haw. 2005) (evaluation containing negative comments "beyond mediocre" constituted adverse employment decision).

Other decisions have found that performance evaluations were not adverse employment actions under the facts and circumstances presented.  See e.g., *Kortan v. California Youth Authority*, 217 F.3d 1104, 1113 (9th Cir. 2000) (no adverse action where performance evaluation was not disseminated beyond a supervisor who corrected and raised low marks, was not sub-average or undeserved, and did not result in negative consequences); *Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002) (performance rating of "fully successful" that did not result in adverse consequences was not an adverse employment action).

Therefore, whether a negative evaluation constitutes an adverse employment action depends on the facts and circumstances of each case; the relevant factors include whether the evaluation was, in fact, negative, how widely it was disseminated, if it was final, and whether it resulted in any adverse employment consequences.

21

Application of these factors here supports finding an adverse employment action. While Eaton generally scored between "Exceeds Expectations" and "Meets Expectations," he was given two unfavorable "Does Not Consistently Meet Expectation" ratings. It also appears the evaluation was final, was shared with, at least, his supervisors, and was submitted to Montana Silversmiths' Human Resources Department where it was presumably placed in Eaton's permanent personnel file. While it is not clear whether Eaton suffered adverse employment consequences directly from the evaluation, performance evaluations were listed as one of the criteria to be considered in the reduction-in-force layoffs. In viewing all inferences drawn from the facts in the light most favorable to Eaton, this showing is sufficient to establish that Eaton's 2017 performance evaluation was an adverse employment action for purposes of a prima facie retaliation claim.

There is also some evidence to support the final requirement, that there was a causal link between the protected activity and the employment action. There is no direct evidence, and scant circumstantial evidence, to connect Eaton's 2015 report of sexual harassment to human resources with his negative evaluation. Any inference that they are causally related is also not supported by the time interval between the two events. Almost two years had passed since that report and his 2017 performance evaluation. To support an inference of causality, the temporal proximity between the two events must be "very close." *Clark Cty. Sch. Dist. v.*

22

*Breeden*, 532 U.S. 268, 273 (2001). But the 2017 evaluation was conducted at the same time as Eaton's report of sexual harassment to Neirby on April 4, 2017. In fact, Neirby made changes to the evaluation after meeting with Eaton on April 4 to allege that Eaton had a "challenging relationship" with his direct supervisor. (Doc. 96-3 at 9.) Given the relatively light burden required to overcome Montana Silversmiths' motion for summary judgment, the evidence is sufficient to create an issue of fact for trial as to causation.

There is also evidence in the record to support Eaton's argument that the negative aspects of the review were unwarranted. As discussed above, the negative comments regarding Eaton's relationship with Travis were inserted in the review at the direction of Neirby, contrary to the wishes of Deacon as his reviewing supervisor. Also, Neirby's subsequent change to the evaluation to allege a problematic relationship between Eaton and Deacon is contradicted by Deacon's testimony that the two got along "pretty good" and never "got into a fight about anything" prior to April 5, 2017. (Doc. 105-4 at 44: 29:18-30:2.) Moreover, as discussed above, the negative rating for allegedly circumventing the company's proper channels to report concerns, directly contravenes Montana Silversmiths' 2015 Employee Manual.

Accordingly, Eaton has presented sufficient evidence to support a prima facie case of retaliation based on an unwarranted negative performance evaluation.

23

Montana Silversmiths did not present any argument on this claim in its motion for summary judgment, and thus did not present a legitimate, nondiscriminatory reason for the action. Therefore, Montana Silversmiths motion for summary judgment as to this claim shall be denied.

### 4. Schedule Change

The same is not true with respect to Eaton's retaliation claim based on a change in work schedule. While Eaton was given permission in September 2014 to work a modified schedule, it was made clear that the goal was to get Eaton on the same schedule with the others in the department. (Doc. 96-2.) When Neirby joined the company as Vice President of Operations, he aligned everyone in the various departments to the same schedule. (Doc. 96-20 at 6: 18:9-13.) It appears Eaton was given additional time, until April 30, 2017, to come into compliance with the requirement. (*Id.*, 19:18-20:5.) Eaton stated that he intended to comply with the change (Doc. 105 at 19), and he expressed his appreciation to Neirby for being given an extension of time to do so. (*Id.*, 20:1-8.)

Requiring an employee to work the same schedule as all other employees while also providing ample time to adjust to a different schedule is not the type of employment action that would dissuade a reasonable worker from making or supporting a charge of discrimination. Accordingly, under the facts presented

24

here, Eaton did not sustain an adverse employment action because of his schedule change sufficient to support a prima facie claim of retaliation.

Therefore, Montana Silversmiths' motion for summary judgment on Eaton's retaliation claims shall be denied as to Eaton's claim based on his 2017 performance evaluation and granted as to all remaining claims.

## B.   Wrongful Termination

In Count to 2 of the Fourth Amended Complaint, Eaton asserts a claim for wrongful termination.  (Doc. 48 at 8.)  Montana's Wrongful Discharge from Employment Act ("WDEA") provides the exclusive remedy for an alleged wrongful discharge under Montana law.  Under the WDEA, a discharge is wrongful only if:

> (1) (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
>
> (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
>
> (c) the employer violated the express provisions of its own written personnel policy.

Mont. Code Ann. § 39-2-904 (2020).  In his complaint, Eaton alleges he was terminated without good cause and the reasons given for his discharge were pretext.  (Doc. 48 at 8.) ("There were pretextual measures taken that transpired into wrongful discharge.  Wrongful termination was provided by pretextual measures.")

The WDEA defines "good cause" as "reasonable job-related grounds for

25

dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Mont. Code Ann. § 39-2-903(5). "A legitimate business reason is one that is not false, whimsical, arbitrary or capricious, and ... must have some logical relationship to the needs of the business." *Putnam v. Cent. Montana Med. Ctr.*, 460 P.3d 419, 423 (Mont. 2020) (citing *Bird v. Cascade Cty.*, 386 P.3d 602, 605 (Mont. 2015) (internal citations omitted)).

An employer must set forth evidence demonstrating good cause for the discharge, whereupon the burden shifts to the employee. *Putnam*, 460 P.3d at 424. "To defeat a motion for summary judgment on the issue of good cause, the employee may either prove that the given reason for the discharge is not good cause in and of itself, or that the given reason is a pretext and not the honest reason for the discharge." *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008) (quotations omitted).

Montana Silversmiths argues that it had a legitimate business reason for terminating Eaton with the 2016 restructuring and cost-savings plan. (Doc. 95 at 17.) Eaton argues Montana Silversmiths lacked good cause and had no legitimate business reason. (Doc. 103 at 27-30.)

As the Court previously found, Montana Silversmiths had a legitimate business reason to terminate Eaton under its restructuring and cost-savings plan in

anticipation of losing $750,000-worth of business from AQHA. This included a reduction-in-force that impacted 29 other employees. For his part, Eaton undisputedly had the lowest score on the cross-training matrix.

Eaton has not produced facts showing that Montana Silversmiths based its decision to terminate his employment on anything other than the restructuring and cost-savings plan. As previously discussed in context of Eaton's Title VII retaliation claim, Montana Silversmiths considered multiple factors, including cross training, in their reduction-in-force decision-making. Eaton has not raised genuine issues of material fact as to the validity of the restructuring and cost-savings plan sufficient to show pretext.

Additionally, although not plainly alleged in his Fourth Amended Complaint, Eaton argues in his response brief that he was terminated for reporting a violation of public policy. (Doc. 103 at 28.) Eaton asserts that he was terminated for reporting sexual harassment and racial discrimination. Thus, he argues, his discharge was in violation of Mont. Code Ann. § 39-2-904(1).

To the extent this claim is properly raised by his pleadings, it is excluded from coverage under the WDEA by Mont. Code Ann. § 39-2-912(1). That section provides that the WDEA does not apply to a discharge "that is subject to any other state or federal statute that provides a procedure or remedy for contesting the dispute ... includ[ing] those that prohibit discharge for filing complaints, charges,

27

or claims with administrative bodies or that prohibit unlawful discrimination based on race, ... sex, age, disability, ... and other similar grounds."

Here, Eaton's claim that he was terminated in retaliation for reporting sexual harassment and racial discrimination falls squarely within Title VII's antiretaliation provision. As discussed above, 42 U.S.C. § 2000e-3(a) makes it unlawful to discriminate against an individual who has "opposed any practice made an unlawful employment practice by this subchapter...." Section 2000e-2(a)(1) provides that it is an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex...." Thus, Title VII of Civil Rights Act of 1964 provides "a procedure or remedy for contesting the dispute" raised by Eaton's WDEA claim for reporting a violation of public policy. Accordingly, the claim is barred from coverage under the WDEA.

Therefore, the Court will grant summary judgment as to Count 2's wrongful discharge claim.

## C.    Disability Discrimination

In Count 3, Eaton claims disability discrimination under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. (Doc. 48 at 10.) Section 12112(a) of the ADA prohibits discrimination against a qualified individual based on disability regarding advancement, discharge, or job training of employees,

28

among other actions. See *E.E.O.C. v. BNSF Ry. Co.*, 902 F.3d 916, 922 (9th Cir. 2018), *as amended* (Sept. 12, 2018). To establish a prima facie case of disability discrimination, Eaton must show he (1) is disabled within the meaning of the ADA, (2) was qualified for the position, and (3) that Montana Silversmiths discriminated against him because of his disability. *Id.* If Eaton satisfies the elements for establishing a prima facie case of disability discrimination, the burden shifts to Montana Silversmiths to show a non-discriminatory reason for discharge similar to Title VII retaliation claims. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). If satisfied, the burden again shifts back to Eaton to show the articulated reason is a pretext for disability discrimination. *Id.*; *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir.1990).

Montana Silversmiths argues that Eaton fails to demonstrate that he is disabled within the meaning of the ADA. (Doc. 95 at 20.) Eaton argues he had a back injury prior to his employment with Montana Silversmiths and then developed carpal tunnel while employed there. (Doc. 103 at 31-32.) Eaton also contends that Montana Silversmiths failed to engage in an interactive process to provide accommodations, such as a modified work schedule, and would not allow him to return to work after medical leave. (*Id.* at 34-35.)

The Court finds that Eaton has failed to establish he is disabled under the ADA, which defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment ...

42 U.S.C. § 12102(1). For the purposes of (1)(A), above, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). For the purposes of (1)(C), above, an individual may be "regarded as having such an impairment" when the individual establishes "that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). However, subsection (1)(C) does not apply to transitory or minor impairments – those with an actual or expected duration of six months or less. 42 U.S.C. § 12102(3)(B).

Here, Eaton claims his back injury and carpal tunnel are disabilities. (Doc. 48 at 10, 13.) But the record simply does not support such a finding. The record is bereft of any evidence of back issues beyond a single medical record from January 2019—approximately 18 months after his termination—denoting "low back and bilateral leg discomfort." (Doc. 105-9 at 64.) While it is undisputed that Eaton suffered from carpal tunnel syndrome and underwent corrective surgery, he does

30

not extend any evidence illustrating that the impairment limited one or more major

life activities or, in the alternative, that after surgery was performed he could be

"regarded as having such an impairment."

Moreover, even if Eaton could establish a prima facie case of disability

discrimination, Montana Silversmiths has shown that it had a nondiscriminatory

reason for Eaton's layoff and termination, as discussed above.

Therefore, the Court finds there is no dispute as to any issue of material fact

that Eaton lacks a disability under the ADA and grants summary judgment as to

Count 3.

### D.    Age Discrimination

In Count 4, Eaton alleges age discrimination under the Age Discrimination

in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Doc. 48 at 13-16.) Under

the ADEA, it is unlawful to discharge any individual because of the individual's

age. 29 U.S.C. § 623(a)(1). Like the Title VII and ADA claims discussed above,

ADEA claims employ the three-stage burden shifting framework, with the claimant

first establishing a prima facie case, then the employer articulating a legitimate,

nondiscriminatory reason for the adverse employment action, and last the

employee proving that the reason advanced by the employer is mere pretext for

unlawful discrimination. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207

(9th Cir. 2008).

31

Generally, to establish a prima facie case under the ADEA, a plaintiff must

show he was (1) at least 40-years old, (2) performing his job satisfactorily, (3)

discharged, and (4) either replaced by a substantially younger employee with equal

or inferior qualification or discharged under circumstances otherwise giving rise to

an inference of age discrimination. *Id.* (internal quotes, citation omitted).

Montana Silversmiths argue that, at a minimum, Eaton's claim is precluded

by the fourth requirement: Eaton did not allege, nor can he prove, he was replaced

by a younger employee. (Doc. 95 at 24.) In support, Montana Silversmiths asserts

that it has not refilled Eaton's position since his termination in 2017. (Doc. 96 at ¶

57.)

This argument misses the mark. Where, as here, the discharge resulted from

a reduction in workforce, a plaintiff "need not show that they were replaced; rather

they need show 'through circumstantial, statistical, or direct evidence that the

discharge occurred under circumstances giving rise to an inference of age

discrimination.'" *Coleman v. Quacker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir.

2000) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990)).

This can be shown where an employer had a continuing need for their services, or

that others not in their protected class were treated more favorably. *Id.*

Consequently, the fact that Montana Silversmiths has not replaced Eaton's

position since his termination is not dispositive of his claim. Nevertheless, it

32

supports the conclusion that Montana Silversmiths did not have a continuing need for his services.

Eaton further argues, however, that younger employees were treated more favorably. He alleges that at least two of his supervisors, Lance Neirby and Curt Robbins, told him that Montana Silversmiths was looking for and needed new engravers. (Doc. 103 at 40.) He also argues that two younger employees, Travis Deacon and Andrew Wells, were treated more favorably and not terminated in the reduction-in-force. (*Id.* at 39-40). Finally, Eaton maintains that by his calculations the number of individuals 40 and over comprise 77.77 percent of layoffs. (*Id.* at 39.)

The Court finds that Eaton has failed to establish a prima facie case of age discrimination. Eaton offers no evidence in support of his contention that Justin Deacon or David Cruz preferred younger engravers, or that Travis Deacon or Andrew Wells were given preferential treatment and not terminated due to their youth.[4] Eaton does not discuss where Travis Deacon was positioned in the layoff matrix. Eaton does contend that Andrew Wells "was written in the layoff matrix, but was not terminated, laid off, or retired." (Doc. 103 at 38.) But it also appears that Wells had only been provided a short apprenticeship in the engraving

---

[4] Eaton attempts to cite to his supplementary "Statement of Disputed Facts" (Doc. 104), which in turn cite to his own submission to the Montana Human Rights Bureau's investigation. (*See e.g.* Docs. 105-6 at 43-57, 59-74; 105-7 at 15-25.)

department before he was transferred to "buffing" in March 2017, prior to the third phase of the reduction-in-force. (Doc. 103 at 38.) It is not clear how that affected the reduction-in-force criteria, and whether some departments were more directly impacted by the process. As noted above, the loss of the AQHA contract resulted in a 50% reduction in the engraving department's work.

Eaton's statistical calculations are likewise insufficient. "To establish a prima facie case based solely on statistics ... the statistics 'must show a stark pattern of discrimination unexplainable on grounds other than age.'" *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990)). Assuming Eaton's "Z-score" analysis is accurate, a single calculation based on one factor is insufficient to establish a "stark pattern of discrimination" or show that the restructuring/cost-savings plan's reduction in force is unexplainable for any other reason. The analysis does not consider any variables other than age. As discussed in *Coleman*, statistics that fail to account for other obvious nondiscriminatory variables that may affect the analysis are of little value and fail to raise a triable issue of fact of intent to discriminate. *Id.* at 1282-83.

Therefore, the Court finds Eaton has failed to establish a prima facie case of age discrimination under the ADEA. Moreover, even if Eaton could establish a

prima facie case of discrimination, Montana Silversmiths has presented a legitimate, nondiscriminatory reasons for his termination.

Accordingly, the Court finds that summary judgment is appropriate as to Count 4.

### E.    Hostile Work Environment

In Count 5, Eaton claims he was subjected to a hostile work environment when Justin Deacon made sexually and racially harassing remarks in his presence at work. (Doc. 48 at 16-19.)  Hostile work environment falls under the protections of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).  To prevail, Eaton must show his "workplace was permeated with discriminatory intimidation … that was sufficiently severe or pervasive to alter the condition of his employment and create an abusive working environment." *Id.* (citing *Harris*, 510 U.S. at 21).  A totality of the circumstances test is used to determine whether an environment is hostile or abusive. *Harris*, 510 U.S. at 23.

Eaton cannot establish a hostile work environment claim.  Eaton has not sufficiently shown his work environment to be so severe or pervasive that it altered

the condition of his employment and created an abusive working environment.

Eaton recounts sporadic incidents over several years in which Justin Deacon used

sexual or racial-based epithets but offers no evidence or argument on how those

events affected him or the workplace. The Court's focus is on the total effect of

the circumstances on the work environment. In *Harris*, the U.S. Supreme Court

suggested this may "include the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work

performance." *Harris*, 510 U.S. at 23. Eaton does not describe the frequency,

severity, or how it interfered with his work performance.

Therefore, the Court finds Eaton has failed to establish a prima facie case of

hostile work environment under Title VII and that summary judgment is

appropriate as to Count 5.

**F.     Defamation**

In Count 6, Eaton alleges defamation arising from verbal statements made to

the MHRB during its investigation regarding his comment about a bomb. He

alleges this affects his ability to find work "in a small community with these

rumors." (Doc. 48 at 19.)

In Montana, either libel or slander effect a claim for defamation. Mont.

Code Ann. § 27-1-801. Libel is a "false and unprivileged publication by writing,

36

printing ... or other fixed representation that exposes any person to hatred ... or causes a person to be shunned ... or that has a tendency to injure a person in the person's occupation." Mont. Code Ann. § 27-1-802. Slander is a "false and unprivileged publication other than libel that ... tends directly to injure a person in respect to the person's office ... or by natural consequence causes actual damage." Mont. Code Ann. § 27-1-803. Defamatory words "must be of such nature that the court can presume as a matter of law that they will tend to disgrace and degrade [the plaintiff] or cause him to be shunned and avoided. It is not sufficient, standing alone, that the language is unpleasant and annoys or irks him, and subjects him to jests or banter, so as to affect his feelings." (Citations omitted) *Ray v. Connell*, 371 P.3d 391, 395 (Mont. 2016).

Montana Silversmiths argues that Eaton admits to making the statement about a bomb, and that relaying the statement to the Montana Human Rights Bureau is privileged under § 27-1-804. (Doc. 95 at 35-36.)

Eaton appears to argue that the statements were made with reckless disregard of whether they were false and were made both internally and externally. (Doc. 103 at 50.)

The Court finds that Eaton has failed to raise genuine issues of material fact to survive summary judgment on his claim for defamation. First, in his affidavit Eaton admits he said: "You guys act like I am going to bring a bomb, that IS NOT

37

what I'm saying, I am saying I am going to have to get a lawyer." (Doc. 103-2 at ¶ 64.) (emphasis in original).  Therefore, even if Eaton disputes precisely what was said or its context, there is no dispute that Eaton made a statement that referenced bringing a bomb.

Second, it is undisputed that both Eaton and employees of Montana Silversmiths recounted their version of the statement, and their interpretation of the statement, to AEM investigators and MHRB investigators.[5]  But even if somewhat inconsistent, those statements were privileged, and absent a showing of malice, cannot form the basis for a slander claim.

Only unprivileged publications are actionable under Montana law.  *Skinner v. Pistoria*, 633 P.2d 672, 675 (1981).  Under Mont. Code Ann. § 27-1-804, privileged communications include those made:

> (1) in the proper discharge of an official duty;
>
> (2) in any legislative or judicial proceeding or in any other official proceeding authorized by law;
>
> (3) in a communication without malice to a person interested therein by one who is also interested or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent or who is requested by the person interested to give the information;

---

[5] Neirby also notified the Stillwater Sheriff's Office regarding the incident where the statement was made, but the report did not include any statement regarding a bomb.  It only recounted that there had been an incident with an employee who was sent home the remainder of the week, but Neirby advised he did not foresee any further problems.

(4) by a fair and true report without malice of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

The first and second communications listed above are absolute privileges. *Skinner*, 633 P.2d at 676. The third and fourth are qualified privileges, requiring the absence of malice. *Rasmussen v. Bennett*, 741 P.2d 755, 758 (1987); *Cox v. Lee Enterprises, Inc.*, 723 P.2d 238, 240 (1986).

The Court finds that any statements made to MHRB are subject to absolute privilege under § 27-1-804(2), because MHRB is authorized by law "to sit in independent judgment of complaints of alleged discrimination," under Mont. Code Ann. § 49-2-205. Eaton does not dispute that MHRB is a government entity authorized by law to adjudicate administrative claims of discrimination.

The statements made to AEM investigators are not raised in Eaton's Fourth Amended Complaint, which only alleges statements made to the Montana Human Rights Board. (*See* Doc. 48 at 19.) Nevertheless, to the extent any such statements have been fairly raised in this action, they are also privileged under § 27-1-803(3). Any statements made to AEM investigators were made "to a person interested therein [AEM investigators] by one who was also interested [Montana Silversmith employee witnesses] . . . or who is requested by the person interested to give the information." In accordance with the plain language of the statute, this privilege has been extended in similar situations involving internal organizational

39

investigations.  See e.g., *Berg v. TXJ Companies*, 2013 WL 3242472 *8-9 (D.

Mont. June 24, 2013) (statement made as part of internal investigation of

misconduct by employee was privileged under § 27-1-802(3)); *Rasmussen v.*

*Bennett*, 741 P.2d 755, 758 (Mont. 1987) (in the absence of malice, statements of

church members made in the course of a disciplinary or expulsion proceeding are

privileged under the section).  Further, any internal communications between

employees of Montana Silversmiths concerning the statement would also fall

within the privilege.  *Rapp v. Hampton Management LLC*, 2018 WL 3470236 *3

(D. Mont. 2018) ("privilege protects communications between an employer and its

employees, so long as the communication is made without malice.")

There is also no evidence of malice regarding Eaton's statement concerning

a bomb.  "To prove malice, [Eaton] must show that defendants' statements were

made 'with knowledge that it was false or with reckless disregard of whether it was

false or not.'" *Rasmussen*, 741 P.2d at 758 (quoting *Williams v. Pasma*, 656 P.2d

212 (Mont. 1982); *New York Times v. Sullivan*, 376 U.S. 254 (1964)).  Here, there

is no evidence that any of the statements alleged were made with knowledge that

they were false.  In fact, all were the same, or substantially similar to, the statement

Eaton acknowledges making.  There are small discrepancies in the various

statements to investigators as to exactly what was said, and there were also some

statements made interpreting Eaton's statement, but none that can be characterized as false.

Thus, the statements allegedly made to investigators are privileged. Montana Silversmiths motion for summary judgment as to Count 6 shall be granted.

## IV.   Eaton's Motions

Eaton has filed a "Motion to Extend Motion to Compel Deadline." (Doc. 97.) It appears Eaton requests that the deadline be moved to "90 days prior to court." (Doc. 98 at 2.) The Court interprets this request to be an extension of time to file motions to compel up to 90 days prior to trial. The motion is not timely, does not present good cause for extending discovery in this case, and will be denied.

The discovery deadline was extended in this case to September 30, 2020. (Doc. 76 at 2). Eaton's request to extend the time to file motions to compel discovery was filed over two months after the expiration of the time for discovery. Eaton has not shown good cause for filing his motion to extend a scheduling deadline well after it expired. Additionally, the Court's scheduling order required that "[a]ll discovery motions shall be filed within fourteen (14) days of the parties' meet and confer." (*Id.* at 7.) It appears that the discovery issue underlying Eaton's

request for an extension involves discovery responses that were provided on May 1, 2020, six months prior to the requested extension.

Eaton has also not shown good cause to modify the Court's scheduling order.  Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").  See also, Court's Scheduling Order (Doc. 43 at 2) ("Continuance of these deadlines will not be granted absent good cause.").

Eaton has also filed a request for hearing on Montana Silversmiths' motion for summary judgment.  (Doc. 109.)  The Court has thoroughly reviewed the parties' submission on the summary judgment motion and has determined that it would not benefit from oral argument.  The request for hearing will be denied.

## V.     Conclusion

**IT IS ORDERED** that Montana Silversmiths' motion for summary judgment (Doc. 94) is **DENIED** with respect to Eaton's claim for retaliation based upon his 2017 performance evaluation and **GRANTED** as to all remaining claims.

**IT IS FURTHER ORDERED** that Eaton's Motion to Extend Motion to Compel Deadline (Doc. 97) and his Motion for Hearing on Motions for Summary Judgment (Doc. 109) are **DENIED**.

DATED this 28th of September, 2021.

SUSAN P. WATTERS
United States District Judge