IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

|  |  |
|---|---|
| ROBERT A. EATON,<br><br>                           Plaintiff,<br><br>vs.<br><br>MONTANA SILVERSMITHS,<br><br>                           Defendant. | CV 18-65-BLG-SPW<br><br><br>ORDER ON MOTION FOR<br>SUMMARY JUDGMENT |

Before the Court is Defendant Montana Silversmith's ("MTS") Third Motion for Summary Judgment. (Doc. 197). MTS moves for judgment on the two remaining issues, a Title VII retaliation claim and an FMLA interference claim. (*Id.*).

## I.    Background

### A. Procedural Background

Eaton originally asserted seven causes of action against MTS: (1) retaliation under Title VII; (2) wrongful termination; (3) disability discrimination; (4) age discrimination; (5) hostile work environment; (6) defamation; and (7) breach of contract (Family Medical Leave Act ("FMLA") claim). (Doc. 48). On September 28, 2021, this Court denied in-part and granted in-part, MTS's Motion for Summary Judgment. (Doc. 113). This Court granted summary judgment on all of Eaton's

1

claims except his Title VII retaliation claim. (*Id.*). This Court found that Eaton presented a prima facie case of retaliation with respect to his 2017 Performance Evaluation ("PE v.1"). (*Id.* at 18).

On May 25, 2022, this Court granted MTS's Second Motion for Summary Judgment and dismissed the remaining retaliation claim. (Doc. 157). In the second order on summary judgment, this Court focused its retaliation inquiry on the changes made to Eaton's PE v.1 after he met with Lance Neirby and Justin Deacon. (*Id.* at 6). Based on the undisputed facts, MTS demonstrated it had a legitimate and non-discriminatory reason for altering Eaton's PE v.1, and this Court granted summary judgment and entered default judgment in favor of MTS. (*Id.* at 7).

Eaton then appealed the order to the Ninth Circuit. (Doc. 159). The Ninth Circuit found that summary judgment was improper on two of the claims. First, dismissal of the FMLA claim was improper because this Court failed to construct Eaton's pro-se pleadings liberally enough, and there were sufficient facts demonstrating Eaton was discouraged from using his FMLA leave. (Doc. 162 at 2–3). Second, the Ninth Circuit found Eaton established a prima facie case of retaliation based on the negative comments inserted into PE v.1 and that this Court mistakenly focused on the changes made in PE v.2. (*Id.* at 12). For these reasons, the Ninth Circuit reversed the dismissal of Eaton's FMLA claim and the grant of summary judgment on his retaliation claim concerning PE v.1. (*Id.* at 15).

2

*B. Factual Background*

The facts of this case have been discussed at length; this Court will only restate the pertinent facts related to the two remaining counts.

On July 29, 2015, Eaton met with Colette Schlehuber ("Ms. Schlehuber") of MTS's Human Resources Department to discuss instances of sexual harassment and the use of racial slurs in the engraving department by Justin Deacon. (Doc. 199 at ¶ 4; Doc. 96-19 at 6–7: 19:17 – 21:14; Doc. 103-2 at 9).  Later that year, Eaton met with Matt Weinman, former VP of Operations, and David Cruz, Justin Deacon's supervisor, to report racially charged comments Justin Deacon was making.  (Doc. 103-2 at 11; Doc. 199-2 at 4-5: 16:23 – 17:06).  On January 24, 2017, Eaton spoke with David Cruz again, this time over concerns of Justin Deacon favoring his son and his continued sexual harassment of female employees. (Doc. 103-2 at 14).

On April 4, 2017, Eaton completed his yearly performance review with Justin Deacon. (Doc. 103-2 at 14-5).  Justin Deacon noted two areas in PE v.1 in which Eaton "Does Not Consistently Meet Expectations" – interaction with co-workers and resolves conflicts in an appropriate manner. (Doc. 199 at ¶ 7; Doc. 96-3 at 7–8).  As to Eaton's "interaction with co-workers," Deacon commented: "at times creates an unwelcoming environment in regard to Travis [Justin Deacon's son] while at the same time interacting well with Rick and Brian." (Doc. 96-3 at 7).  As to how Eaton resolves conflicts, Deacon commented: "[Eaton] sidesteps proper reporting of

concerns outside the management hierarchy." (*Id.*). Eaton was also found to significantly exceed expectations in the area of being a "[s]elf starter, shows resourcefulness," for which Justin Deacon commented that he was a "very hard worker, always on task." (*Id.*). In sum, Eaton's total appraisal grade was 2.70, placing him between the ratings for "Exceeds Expectations" (2.0) and "Meets Expectations" (3.0). (*Id.* at 8; Doc. 105-10 at 36). Mr. Neirby consulted Justin Deacon during the completion of PE v.1. (Doc. 96-21 at 8: 28:17 – 21). At Mr. Neirby's direction, Justin Deacon inserted the comment about Travis Deacon. (Doc. 105-4 at 44: 29:7 – 17).

Following the performance evaluation, Eaton spoke with Rick Waltner, a co-worker in the engraving department. (Doc. 103-2 at 16). Waltner advised Eaton he should get a lawyer. (*Id.*). On the evening of April 4, 2017, Eaton spoke with Mr. Neirby about his concerns with his evaluation and Justin Deacon's harassment of MTS employees. (Doc. 199 at ¶ 25; Doc. 96-18 at 10: 34:14 – 22).

The following day, April 5, 2017, Eaton met with Mr. Neirby and Justin Deacon to discuss PE v.1 and the issues Eaton brought to Mr. Neirby's attention the day before. (Doc. 199 at ¶ 26; Doc. 96-18 at 10: 35:07 – 23). During that meeting, Mr. Neirby changed the comments regarding Travis Deacon on Eaton's PE v.1 to instead state, "challenging relationship exists between employee and direct supervisor." (Doc. 199 at ¶ 28; Doc. 96-18 at 10: 36:07 – 13). The Revised 2017

4

Performance Evaluation (PE. v.2) also deleted a comment in the original evaluation, which read, "Robert will not acknowledge Travis's existence." (Doc. 96-3 at 8, 9). Mr. Neirby testified that he changed the comments to defuse Eaton's hostility and temper at the April 5 meeting between himself, Eaton, and Justin Deacon. (Doc. 199 at ¶ 29; Doc. 96-20 at 12: 44:03 – 19).

Eaton took a scheduled medical leave on April 14 for carpal tunnel release surgery. (Doc. 199 at ¶ 24). On June 1, 2017, while on workers compensation leave, Eaton called Ms. Schlehuber, requesting FMLA benefits related to his surgery. (Doc. 199 at ¶ 48; Doc. 96-19 at 15: 54:03 – 11; Doc. 105-12 at 8). Ms. Schlehuber told Eaton he was not eligible for FMLA benefits because he was already on workers compensation. (Doc. 96-19 at 15: 54:03 – 11; Doc. 105-12 at 8). According to the MTS handbook, "worker's compensation leave ... will be designated as FMLA leave and will run concurrently with FMLA." (Doc. 105-8 at 29).

Eaton also informed Ms. Schlehuber that his physician had updated his medical status, extending his leave until June 12. (Doc. 105-12 at 8, 9). Ms. Schlehuber advised Eaton that he would need a medical release form for his return. (*Id.* at 10). Before his return, on June 15, 2027, Eaton's employment was terminated as part of Phase 3 of MTS's Reduction in Force ("RIF") plan. (Doc. 105 at ¶¶ 50, 52). MTS's decision to proceed with Phase 3 of the RIF was based on the loss of American Quarter Horse Association's ("AQHA") sponsorship agreement. (*Id.* at ¶

5

59). AQHA was a significant source of revenue for MTS and provided a large portion of the workload for the Engraving Department, where Eaton was employed. (Doc. 199 at ¶ 56). The criteria for termination included skills and cross-training, performance evaluations, disciplinary actions, and value to future business. (Doc. 105 at ¶ 51).

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Id.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass's*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. If the moving party fails to discharge this initial burden, summary judgment must be denied; the court need not consider the non-moving party's evidence. *Adickes v. S. H Kress & Co.,* 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).    In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).    The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson,* 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita,* 475 U.S. at 587.    "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson,* 477 U.S. at 255.

## III.    Discussion

### A.    *Law of the Case Doctrine*

The Law of the Case doctrine requires a district court to follow the appellate court's resolution of an issue of law in all subsequent proceedings in the same case. *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186 (9th Cir. 2001). Because the purpose of the doctrine is to promote judicial finality, it necessarily follows that the Law of the Case doctrine acts as a bar only when the issue in question was considered and decided by the first court. *U.S. v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995). MTS argues that the Law of the Case doctrine does not prevent this Court from considering summary judgment on Eaton's retaliation claim because the Ninth Circuit found that "[this Court] did not discuss Eaton's claim that the PE v.1 negative evaluation was retaliatory". (Doc. 205 at 13 (quoting Doc. 162 at 12)).

This Court's May 25, 2022, order on Summary Judgment determined that MTS had a legitimate and non-discriminatory reason for altering Eaton's PE v.1. (Doc. 157 at 7). This Court granted summary judgment for MTS on Eaton's Title VII retaliation claim. (*Id.*). Since no issues remained in controversy, judgment was entered in favor of MTS. (Doc. 158). Eaton then appealed this decision to the Ninth Circuit. (Doc. 159).

On appeal, the Ninth Circuit found that Eaton established a prima facie case that PE v. 1 was retaliatory. (Doc. 162 at 12). According to the Ninth Circuit, Eaton engaged in protected activity when he reported alleged instances of sexual

harassment and racial discrimination. (*Id.*). His PE v.1 was an adverse employment decision because it gave Eaton low marks in two categories, was final, shared with his supervisors, submitted to the Human Resources Department, and listed as one of the criteria to be considered in the RIF. (*Id.* at 12 – 13). And there was evidence to suggest a causal link existed between the protected activity and the adverse employment decision. (*Id.* at 13).

In their order, the Ninth Circuit noted that "[this Court] did not discuss Eaton's claim that the PE v.1 negative evaluation was retaliatory. Instead, it focused entirely on whether MTS articulated a legitimate, nondiscriminatory reason for the change from PE v.1 to PE v.2, and whether the proffered legitimate reason was pretextual." (Doc. 162 at 12). Since this Court did not consider if Eaton's low marks in PE v.1 were retaliatory, the Law of the Case Doctrine will not prevent an evaluation of the Title VII retaliation claim on the instant motion.

### B.    *Title VII Retaliation Claim*

Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

VII]." 42 U.S.C. § 2000e-3(a); *See also, Lyons v. England*, 307 F.3d 1092, 1103 (9th Cir. 2002).

To establish a prima facie case of retaliation, Eaton must establish that: (1) he engaged in a protected activity, (2) his employer took an adverse employment action, and (3) a causal connection existed between the first two elements. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir. 2006). A protected activity includes opposing "any practice made an unlawful employment practice under [Title VII]." 42 U.S.C. § 2000e-3(a). The Ninth Circuit has recognized that an employee's complaint regarding the treatment of others in his workplace is considered a protected activity under Title VII. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

If Eaton successfully proves a prima facie case, the burden shifts to MTS "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 253 (1981) (internal citation omitted) *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983). The employer "need not persuade the court that it was actually motivated by the proffered reasons ... it is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]." *Burdine*, 450 U.S. 248 at 254-55.

If MTS meets its burden, then Eaton has an opportunity to prove by a preponderance of the evidence that the reason proffered by MTS was merely pretext for discrimination. *Id.* at 256. "Only a small amount of direct evidence is necessary in order to create a genuine issue of material fact as to pretext." *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). However, "[c]ircumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Id.*

MTS argues that summary judgment is proper on the retaliation claim because Eaton cannot show a sufficient "but-for" causal connection between his protected activity and the adverse employment action. (Doc. 198 at 6-7). According to MTS, Eaton cannot establish the causal link because he cannot show that the individual decision-makers responsible for completing PE v.1 knew about his harassment complaints before completing the evaluation. (*Id.* at 9). Further, even if Eaton could establish a prima facie case of retaliation, the undisputed material facts demonstrate that MTS had a legitimate business justification for the adverse employment action, and Eaton cannot prove the justification was pretextual. (*Id.* at 7). In response, Eaton argues that his supervisor, Mr. Neirby, was aware of Eaton's complaints about sexual and racial harassment. (Doc. 200 at 11). Further, Mr. Neirby's knowledge of Eaton's protected activity is demonstrated by his request to Justin Deacon to write

in PE v.1, "[Eaton] sidesteps proper reporting of concerns outside management hierarchy." (*Id.*).

Eaton has presented sufficient evidence to establish a prima facie case of retaliation. Eaton engaged in protected activity when he repeatedly reported alleged instances of sexual and racial harassment to MTS employees. *Archuleta v. Corr. Corp. of Am.*, 829 F. App'x 242, 243 (9th Cir. 2020) ("Filing an internal complaint pursuant to an established reporting procedure, raising concerns in a discussion with a human-resources representative, or filing an EEOC complaint are all protected activities."). On July 29, 2015, Eaton met with Ms. Schlehuber to discuss allegations of sexual harassment by his direct supervisor, Justin Deacon, and met with Mr. Neirby on April 4, 2017, to report the same. (Doc. 199 at ¶ 4, Doc. 41 at ¶¶ 6, 8; Doc. 96-19 at 6: 19:17 – 20:07). Eaton also filed a personal knowledge affidavit stating that he continued to report instances of sexual and racial harassment he observed at MTS from 2015 to 2017. (Doc. 103-2 at 9-12).

Second, Eaton suffered an adverse employment action when he received low marks in his PE v.1. As this Court noted in its first summary judgment order, whether a negative performance evaluation can be an adverse employment action depends on the facts and circumstances of each case, and "the relevant factors include whether the evaluation was, in fact, negative, how widely it was disseminated, if it was final, and whether it resulted in any adverse employment

12

consequences." (Doc. 113 at 21) *see Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987 ("undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under [Title VII]"); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are ... undeserved negative performance review[s]"); *Kortan v. California Youth Authority*, 217 F.3d 1104, 1113 (9th Cir. 2000) (no adverse action when performance evaluation was not disseminated beyond a supervisor and did not result in negative consequences).

Justin Deacon, Eaton's supervisor, completed Eaton's PE v.1, and Eaton received the lowest possible marks in two areas: interactions with co-workers and resolving conflicts in an appropriate manner. Eaton's total appraisal grade was 2.70, placing him between the ratings of "Exceeds Expectations" (2.0) and "Meets Expectations" (3.0). As part of PE v.1, Eaton met with Mr. Neirby to discuss the evaluation. (Doc. 199 at ¶ 25; Doc. 41 at ¶ 8). The following day, Eaton met with Mr. Neirby and Justin Deacon to discuss PE v.1. (Doc. 96-18 at 10: 35:07-23). During that meeting, Mr. Neirby changed the comments regarding Travis Deacon to "[a] challenging relationship exists between employee and direct supervisor." (Doc. 199 at ¶ 28, Doc. 96-18 at 10: 36:07-13). Eaton's evaluation scores were unchanged, and the overall score remained at 2.70. (*See* Doc. 96-3 at 7-8, Doc. 96-3 at 9-10). On June 15, 2017, Eaton was terminated as part of Phase 3 of MTS's RIF. One of

the criteria used to determine who would be included in the RIF was performance evaluations. (Doc. 105 at ¶ 51).

Here, the evaluation score in PE v.1 was final, was shared with his supervisors, and performance evaluations were listed as one of the criteria used in Eaton's termination. Given these facts and viewing all inferences drawn from the facts in the light most favorable to Eaton, the evidence is sufficient to establish that the comments and low marks in PE v.1 were an adverse employment action.

Last, there is sufficient evidence to suggest a causal link between Eaton's reports of harassment and the negative comments inserted into PE v.1. To establish a causal link between the negative comments and low scores in PE v.1 and Eaton's protected activity, Eaton must show the defendant was aware that he engaged in protected activity. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 325 F.ed 1185, 1197 (9th Cir. 2003). "Logically, only events taking place before the decision to take an adverse employment action and known to the employer at the time could have caused the employer's decision." *Maner v. Dignity Health*, 9 F.4th 1114, 1127 (9th Cir. 2021).

In this Court's first summary judgment order, we concluded that some evidence existed to support a causal link because PE v.1 was conducted at the same time as Eaton's report of sexual harassment to Neirby on April 4, 2017. (Doc. 113 at 23). Based on a review of the factual record, this Court can no longer agree with

14

its previous conclusion. According to Eaton's personal knowledge affidavit, "on or about April 4, 2017, I completed my yearly performance review with … Justin Deacon, in which the marks [and comments] were downgraded." (Doc. 103-2). Mr. Neirby consulted Justin Deacon during the completion of PE v.1. (Doc. 96-21 at 8: 28:17 – 21). At Mr. Neirby's direction, Justin Deacon inserted comments about Eaton's behavior in the workplace. (Doc. 105-4 at 44: 29:7 - 17). Following this meeting, Eaton spoke with Rick Waltner, a co-worker in the Engraving Department. Waltner advised Eaton he should get a lawyer. (Doc. 103-2 at 16). Then, on the evening of April 4, 2017, Eaton spoke with Mr. Neirby about his concerns with his evaluation and Justin Deacon's harassment of MTS employees. (Doc. 96-18 at 10: 34:14 - 22). Because Eaton met with Mr. Neirby to report Justin Deacon's harassment after PE v.1 was completed, no causal link exists between Eaton's conversation with Mr. Neirby on April 4, 2017, and the negative comments in PE v.1.

However, other facts alleged by Eaton establish a genuine dispute as to whether Mr. Neirby was aware of Eaton's protected activity when assisting Justin Deacon in completing PE v.1. In Mrs. Schlehuber's deposition she testified that in 2017, she reported Eaton's grievances about Justin Deacon to Mr. Neirby. (Doc. 96-19 at 77: 21 – 25). According to Mrs. Schlehuber, she discussed Eaton's allegations of sexual harassment and racial discrimination with Mr. Neirby. (*Id.* at 78: 2 – 13).

In addition, on January 24, 2017, Eaton spoke with David Cruz, an MTS employee, about Justin Deacon's sexual harassment of other employees. (Doc. 103-2 at 14). David Cruz told Eaton that he would inform Mr. Neirby about his concerns that evening. (Id.). At his deposition, when asked whether he relayed these concerns to Mr. Neirby, David Cruz responded, "If I said I would, I probably did" (Doc. 199-2 at 9: 35:15 - 20). Viewing these facts in the light most favorable to Eaton, a reasonable juror could conclude that Mr. Neirby was aware of Eaton's complaints when he inserted the negative comments into PE v. 1.

The burden now shifts to MTS to present a legitimate, non-discriminatory reason for the low ratings and negative comments. Eaton's PE v.1 had two negative comments at issue: (1) he created an unwelcoming environment and (2) he "[s]idesteps proper reporting of concerns outside management hierarchy." MTS has presented sufficient evidence of a legitimate non-discriminatory reason for the unwelcoming environment comment but has failed to do so for the comment regarding Eaton's improper reporting.

According to Mr. Neirby, the reason the unwelcoming environment comment was added to PE v.1 "is because [Eaton's] inability to effectively communicate was leaving the team feeling as if they were walking on eggshells." (Doc. 199 at ¶ 12, Doc. 96-20 at 11: 38:19-39:01). Travis Deacon testified that Eaton would leave him feeling "tense" and "uneasy." (Doc. 199 at ¶ 14; Doc. 199-1 at 5: 27:01-25). At his

deposition, Travis Deacon recalled when Eaton told him "a story about beating a guy up one time really bad, and that made me feel not comfortable." (Doc. 199-1 at 5: 27:18-25). David Cruz, an MTS employee, testified that he preferred that Eaton did not work at MTS anymore because "[Eaton] used to get so red when [he] and Justin [Deacon] would get into an argument. And that's why I said I'd rather [you don't] work here anymore." (Doc. 199-2 at 6: 23:24-24:02). Multiple MTS employees testified that Eaton's behavior made them uncomfortable in the workplace, and this sentiment was reflected in PE v.1.

However, MTS has not proffered a legitimate reason for the improper reporting comment. MTS argues that Eaton went around his direct supervisor to HR or other management level employees on several occasions. (Doc. 198 at 13). Eaton reported concerns about sexual harassment and racial discrimination on July 29, 2015, to Ms. Schlehuber in HR. (Doc. 96-19 at 6-7: 19:17 – 21:14). Later that year, Eaton met with Matt Weinman, former VP of Operations, and David Cruz, Justin Deacon's supervisor, to report racially charged comments Justin Deacon was making. (Doc. 103-2 at 11; Doc. 199-2 at 10: 14-18; Doc. 199-3 at 4: 9:10-17). On January 24, 2017, Eaton spoke with David Cruz again, this time over concerns about Justin Deacon favoring his son and his continued sexual harassment of female employees. (Doc. 103-2 at 14). On April 4, 2017, Eaton met with Mr. Neirby, VP

of Operations, and reported his observations of sexual and racial harassment. (Doc. 199 at ¶ 25; Doc. 96-18 at 10: 34:14-22).

The MTS employee manual directs employees to "discuss their concerns with their immediate supervisor, Human Resources or any member of management." (Doc. 105-8 at 8). Here, Eaton discussed his concerns with management personnel and HR staff. Despite this, PE v.1 stated that Eaton "[s]idesteps proper reporting of concerns outside management hierarchy." This comment directly contravenes MTS's employee manual. MTS has failed to proffer a legitimate, non-discriminatory reason for the improper reporting comment. Therefore, MTS's Motion for Summary Judgment on Eaton's retaliation claim is denied.

C.    *FMLA Interference Claim*

The FMLA creates two interrelated substantive rights for employees. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). First, an employee has the right to take up to twelve weeks of leave from work for personal medical reasons, to care for their newborn babies, or to care for family members with serious illnesses. *Id.*; 29 U.S.C. § 2612(a). Second, an employee who takes FMLA leave has the right to be restored to his or her original position, or to a position equivalent in benefits, pay, and conditions of employment upon return from leave. *Id.*; § 2614(a). To prevail on an FMLA interference claim, a plaintiff first must prove that their employer violated the FMLA by interfering with, restraining, or denying the exercise

18

or the attempt to exercise the plaintiff's FMLA rights. *Ragsdale v. Wolverine World Wide, Inc.*, 553 U.S. 81, 89 (2002). The plaintiff then must demonstrate that the employer's FMLA violation caused them prejudice. *Jergens v. Marias Med. Ctr.*, 2022 WL 1577804 at *1 (9th Cir. May 19, 2022).

MTS argues that summary judgment on the FMLA interference claim is proper because Eaton cannot prove he suffered any prejudice from the interference. (Doc. 198 at 15). According to MTS, Eaton was provided with paid workers compensation leave for the same injury he claims he should have been given FMLA leave, and the workers compensation went past the 12 weeks that he would have received under the FMLA. (*Id.*). In response, Eaton argues that his termination was directly related to his FMLA request and violated the guaranteed protections under the FMLA. (Doc. 200 at 19).

As the Ninth Circuit found, there are sufficient facts alleged to find that MTS interfered with Eaton's FMLA leave. (Doc. 162 at 3). On April 14, 2017, Eaton had right carpal tunnel release surgery. Following his surgery, Eaton went on paid worker's compensation leave. (Doc. 199 at ¶ 24). On June 1, 2017, while on workers compensation leave, Eaton had a phone call with Mr. Schlehuber, an HR staff member, where he requested FMLA benefits related to his surgery. (Doc. 199 at ¶ 48; Doc. 96-19 at 15: 54:06-11; Doc. 105-12 at 8). Mr. Schlehuber told Eaton he was not eligible for FMLA benefits because he was already on workers

compensation despite the MTS handbook stating that "worker's compensation leave ... will be designated as FMLA leave and will run concurrently with FMLA." (Doc. 96-19 at 15: 54:06-11; Doc. 105-12 at 8; Doc. 105-8 at 29). Further, when Eaton was terminated on June 15, 2017, he had only been on leave for eight weeks when he was guaranteed twelve weeks under the FMLA. MTS, therefore, likely violated the FMLA. The remaining issue is whether the interference prejudiced Eaton.

When a party alleges a violation of §2615(a)(1), it is known as an "interference" or "entitlement" claim. *Sanders v. City of Newport*, 657 F.3d 772, 777-778 (9th Cir. 2011). "The right to reinstatement guaranteed by § 2614(a)(1) is the linchpin of the entitlement theory, because 'the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation that an employee will return to work after the leave ends.'" *Id.* at 778 (citing *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (quoting *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 78 (8th Cir. 2005).

The right to reinstatement has limits. The FMLA provides that "nothing in this section shall be construed to entitle any restored employee to ... any right, benefit, or position of employment, other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." § 2614(a)(3)(B). "[A]n employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny

20

restoration to employment." 29 C.F.R. § 825.312(d). "Thus, the plain language of the pertinent [Department of Labor] regulations provides that the burden is on the employer to show that he had a legitimate reason to deny an employee reinstatement." *Sanders*, 657 F.3d at 780.

As this Court found and the Ninth Circuit affirmed, MTS had a legitimate business reason to terminate Eaton's employment unrelated to his FMLA leave. (Doc. 113 at 27; Doc. 162 at 6). In 2016, MTS initiated a restructuring and cost-savings plan in anticipation of losing $750,000 worth of business, which substantially impacted the engraving department where Eaton worked. (Doc. 113 at 17). As part of the restructuring plan, MTS terminated Eaton and twenty-nine other employees. (*Id.*). Among the criteria for termination were skills and cross-training, performance evaluations, disciplinary actions, and value to future business. (*Id.* at 10). Eaton's scores on the cross-training matrix were undisputedly the lowest in the company. (*Id*). Therefore, this Court found that MTS had a legitimate business reason to terminate Eaton under its restructuring and cost-savings plan. (*Id.* at 27). In reviewing this Court's decision, the Ninth Circuit agreed that Eaton "fail[ed] to proffer any evidence in support" of his contention that MTS's offered reasons for Eaton's termination were pretextual or that his score on the matrix was inaccurate. (Doc. 162 at 6).

Eaton has not alleged new facts that would prove the proffered reasons for his termination were pretextual or that his score on the matrix was inaccurate. Accordingly, this Court will not depart from its previous determination that MTS had a legitimate, non-discriminatory reason for terminating Eaton. Because Eaton would have been terminated whether he received FMLA benefits or not, he cannot establish that he was prejudiced by MTS's interference with his FMLA leave. Therefore, MTS's Motion for Summary judgment on the FMLA retaliation claim is granted.

## IV.    Conclusion

IT IS HEREBY ORDERED that MTS's Third Motion for Summary Judgment is GRANTED in-part and DENIED in-part.

The motion is granted as to Eaton's FMLA interference claim and denied as to his Title VII retaliation claim.

DATED this _3rd_ day of February, 2025.

SUSAN P. WATTERS
United States District Judge